UNITED STATES *v.* HOCHSCHILD, KOHN & CO. (No. 4429)[1]

United States Court of Customs and Patent Appeals, November 1, 1943

*Paul P. Rao,* Assistant Attorney General (*Richard F. Weeks* and *Joseph F. Donohue,* special attorneys, of counsel), for the United States.

*Tompkins & Tompkins* (*J. Stuart Tompkins* of counsel) for appellee.

[1] C. A. D. 255.

[Oral argument October 5, 1943, by Richard F. Weeks; submitted on brief by appellee]

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges

GARRETT, Presiding Judge, delivered the opinion of the court:

This is an appeal by the Government from the judgment of the United States Customs Court, Second Division, sustaining two protests (consolidated for trial) made by the importer against the classification by the Collector of Customs at the port of Baltimore, Md., of merchandise, described in the invoice as hand knitted infants' woolen sacque sets, and awarding importer refund of a portion of the duties assessed and collected as a result of such classification.

Two samples representative of the imported merchandise were introduced in evidence as Collective Exhibits 1 and 2. Of these; Collective Exhibit 2 seems to have been taken from the importation. It is stated to be the official sample. It consists of a sacque, bootees, and cap (infants' size) which as a "set" (in which form it is stated to be always sold) constitutes a complete suit of knitted or crocheted infants' outerwear. The material is wool or in chief value of wool. The yarns in the bodies of the respective units of the official sample are blue in color, but those comprising the edges are white. The edges were knit in scalloped form as a part of the suit and had no prior separate existence. According to the testimony of the importer's witness they serve to prevent the raveling or breaking of the bodies of the units. The stitching in yoke, body, and edge, respectively, of the sacque is of different kinds.

The controversy here involves the character of the edges, and as presented before us is limited to the question of whether in a tariff sense they constitute trimmings.

The collector classified the merchandise under paragraph 1529 (a) of the Tariff Act of 1930 which provides for a large number of articles including "edgings, *trimmings*, fringes, gimps, and ornaments; * * * all the foregoing, and fabrics and *articles wholly or in part thereof* * * * 90 per centum ad valorem." [Italics supplied.]

In its protests the importer made alternative claims, but that finally relied upon and sustained by the trial court is that the merchandise is properly dutiable under paragraph 1114 (d) of the act as modified by the British Reciprocal Trade Agreement, T. D. 49753 (74 Treas. Dec. 253), as "Hand knitted infants' woolen sacque sets," at 50 per centum ad valorem plus 50 cents per pound.

Paragraph 1114 (d) as it appears in the Tariff Act of 1930 reads:

(d) Outerwear and articles of all kinds, knit or crocheted, finished or unfinished, wholly or in chief value of wool, and not specially provided for, valued at not more than $2 per pound, 44 cents per pound and 45 per centum ad valorem; valued at more than $2 per pound, 50 cents per pound and 50 per centum ad valorem.

The British Trade Agreement modified the subparagraph in certain particulars. The clauses here pertinent read:

\* \* \* \* \* \* \*

Infants' outerwear valued at more than $2 per pound:
Made or cut from Jersey fabric knit in plain stitch
on a circular machine_____ 50¢ per lb. and 25% ad val.
*Other_____ 50¢ per lb. and 50% ad val.*

The claim of the importer is under the provision which we have italicized.

As has been indicated, the sole question, as the case has been presented before us, is whether the above described scalloped edges of the articles constitute trimmings in the sense of paragraph 1529 (a). If they do, the completed articles obviously are in part of trimmings and the collector's classification should be upheld, and the judgment of the trial court reversed. If not, the judgment sustaining the importer's claim should be affirmed.

In view of the record and briefs before us it is proper to say that the Government contended below that the edges were in fact covered by at least one of three of the things named *eo nomine* in paragraph 1529 (a), to wit: trimmings, edgings, or ornaments, but upon the record the trial court declined to consider whether or not the suits were composed in part of edgings or ornaments, and in the appeal to us no claim was made that the scalloped edges were ornaments within the tariff meaning of the term "ornaments," as used in paragraph 1529 (a). One of the Government's assignments of error before us was to the effect that if the scalloped edges were found not to be trimmings they should be held to be edgings, but during the oral argument counsel for the Government expressly withdrew that assignment of error.

The importer called as a witness Mrs. Sarah B. Chamlliss, general manager of importer's infants' wear department and buyer of infants' wear, who prepared the memorandum for the order of the merchandise in question. She testified, in substance, that she had herself made infants' suits like those involved; that they are made "with a crochet needle and yarn"; that she was familiar with trimmings, having dealt with and sold them; that the scalloped edge had to be on the garment for a finish, "Otherwise the edge would be too weak and the garment would break, and would not give satisfactory wear"; that "the scalloping is put on there to reinforce the edge"; that if not scalloped it would be necessary to use "an edge or binding"; that the edge is not fancy but "a plain edge as you get with a needle \* \* \* as plain an edge as you can possibly imagine"; that it is less expensive to make it as described than it would be to impose a plain binding, and that the scalloped edges are not trimmings as the term "trimmings" is commonly understood.

The witness also produced some infants' bootees that were introduced as Illustrative Exhibits A and B, respectively, which she described as being trimmed. Of Exhibit A, she said:

This is trimmed in three different manners; it has an addition of lace, it has embroidery, and has an extra crochet of contrasted material which is superfluous to the garment, it is not necessary.

Exhibit B was also described by the witness as having an embellishment around the upper edge of the body "not necessary to the body of the garment."

The Government called as a witness the examiner who passed upon the importation. His testimony is summarized in the Government's brief before us as follows, the record pages being omitted:

Edward I. Stofman, who was the Examiner, had held that position for three years, having passed on textiles, wool and cottons * * *. Although he was graduated at the Philadelphia Textile School, his familiarity with the meaning of the term "trimmings" originated with his customs work and not with his scholastic education * * *. His advisory classification in the instant case was dictated by the scalloped edge effect on the garments in Collective Exhibit 2. The white material is contrasted with the blue and constitutes the scallop. It is a different type of work than that in the body of the garment. In the Examiner's opinion the garment would be complete without this so-called edging, and the edging gives it an ornamental effect. It serves no practical or utilitarian purpose. There would have to be some kind of binding on the edge but that does not require so extensive a piece of material. As the garment shows, the edging embellishes and gives the garment an ornamental character * * *. The scalloped edge which the witness termed an edging was made in the course of the manufacture of the sacque and the boots. The yoke is of one kind of stitch, the body of another kind, and the scallop or outside portion of still another kind * * *.

It is contended by the Government that the evidence itself, even that of the importer's witness, supports the collector's classification, and that "quite apart from the testimony * * * the samples themselves prove that they are in part of trimmings * * *" under dictionary definitions quoted as follows:

Webster's New International Dictionary—
trimming. * * *
2. That which serves to trim, make complete, ornament, or the like; esp., necessary or ornamental fittings or appendages, as of a garment; * * *.
Funk & Wagnall's Standard Dictionary—
trimming, * * * 1. Something added for ornament or to give a finished appearance or effect; that which embellishes or completes. (1) Material attached to a garment or the like for ornamentation.

It is said in the brief that the fact that the scalloped edges had no independent preexistence but were knit in connection with the body of the units composing the garment has no bearing on the question of whether they are trimmings, the decision of this court in the case of *Alfred Kohlberg, Inc.* v. *United States*, 27 C. C. P. A. (Customs) 354, C. A. D. 111, being cited as authority for the contention.

The merchandise involved in that case consisted of crocheted, or knitted, cotton gloves having lace cuffs, which cuffs had no independent preexistence but were crocheted along with the other parts of the gloves, the entire article being produced "in one continuous [knitting] process." It was held by the majority of this court (as was held by the trial court), in effect, that the fact that the lace cuffs did not have an independent preexistence did not prevent classification of the gloves under paragraph 1529 (a) as articles in part of lace, and distinguished the case from a line of decisions rendered in other cases upon different states of fact.

The rule thus announced is pertinent to the case at bar provided the scalloped edges are trimmings. Otherwise, it has no application here.

In that case the fact that the lace portions of the articles were lace was not in question. Here the question of whether the scalloped edges are trimmings is in issue and, in fact, constitutes the sole issue.

We have examined the samples before us in the light of the testimony concerning the nature and purpose of the scalloped edges, and we feel constrained to agree with the conclusion of the trial court.

It is true that the dictionary definitions of the term "trimming" above quoted are broad, but it is to be observed that each of them, taken as a whole, clearly embraces the feature of ornamentation as a purpose in the application of the trimming element.

As is pointed out in the decision of the trial court, paragraph 1529 (a) does not contain any provision for scalloped articles and in that respect it may be remarked that the paragraph seems to differ from its predecessor paragraph 1430 of the Tariff Act of 1922.

We think the trial court reached the correct conclusion and the judgment is *affirmed*.